## * * § 362 INFORMATION COVER SHEET * *

In Re: Lakeside Professional Cen___
**DEBTOR**
Umpqua Bank
**MOVANT**

Case No: BK-15-50951
CHAPTER: 11

MOTION #: ___

### Certification of Attempt to Resolve the Matter Without Court Action:

Moving counsel hereby certifies that pursuant to the requirements of LR 4001(a)(2), an attempt has been made to resolve the matter without court action, but movant has been unable to do so.

Date: October 5, 2015    Signature: /s/ Scott S. H___
Attorney for Movant

PROPERTY INVOLVED IN THIS MOTION: Real property located in Reno, Nevada at 371___
NOTICE SERVED ON: Debtor(s) ___ ; Debtor's counsel ✓ ; Trustee ✓ ;
DATE OF SERVICE: October 5, 2015

| MOVING PARTY'S CONTENTIONS: | DEBTOR'S CONTENTIONS: |
|---|---|
| The EXTENT and PRIORITY of LIENS: | The EXTENT and PRIORITY of LIENS: |
| 1st Umpqua Bank | 1st ___ |
| 2nd Lakeside Professional Center Managem___ | 2nd ___ |
| 3rd ___ | 3rd ___ |
| 4th ___ | 4th ___ |
| Other: ___ | Other: ___ |
| Total Encumbrances: $1,361,288.27 | Total Encumbrances: ___ |
| APPRAISAL of OPINION as to VALUE: | APPRAISAL of OPINION as to VALUE: |

| TERMS of MOVANT'S CONTRACT with the DEBTOR(S):: | DEBTOR'S OFFER of "ADEQUATE PROTECTION" for MOVANT : |
|---|---|
| Amount of Note: 1,184,593.90 | . |
| Interest Rate: 4.5% | . |
| Duration: 12 months | . |
| Payment per Month: $8,000 | . |
| Date of Default: January 21, 2015 | . |
| Amount in Arrears: Note Matured | . |
| Date of Notice of Default: March 31, 2015 | . |
| SPECIAL CIRCUMSTANCES: Please see Motion on File. | SPECIAL CIRCUMSTANCES: |
| SUBMITTED BY: /s/ Scott S. Hoffmann | SUBMITTED BY: ___ SIGNATURE: ___ |

Scott S. Hoffmann, SBN 8498
LEWIS ROCA ROTHGERBER LLP
50 West Liberty Street, Suite 410
Reno, NV 89501-1922
775.823.2900
775.823.2929/Fax
SHoffmann@LRRLaw.com
*Attorneys for Umpqua Bank*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>LAKESIDE PROFESSIONAL CENTER, LLC,<br>          Debtor. | Case No.: BK-15-50951-btb<br><br>Chapter 11<br><br>**MOTION OF UMPQUA BANK PURSUANT TO 11 U.S.C. §§ 1112(B), 362(D), 361, AND 363 FOR AN ORDER DISMISSING THE BANKRUPTCY CASE, OR IN THE ALTERNATIVE, GRANTING RELIEF FROM THE AUTOMATIC STAY**<br><br>Hearing Date: November 3, 2015<br>Hearing Time: 2:00 p.m. |

Umpqua Bank ("Umpqua"), respectfully moves the Court for (i) dismissal of this Chapter 11 case (the "Chapter 11 Case") filed by Lakeside Professional Center, LLC (the "Debtor"), or, in the alternative, (ii) relief from the automatic stay to allow Umpqua to move forward with its foreclosure on its collateral for which it has a security interest and to prosecute its claim against the Guarantor for any deficiency. In support of its motion ("Motion"), the Lender states as follows:

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 1112(b), 361, 362(d) and 363 of title 11 of the United States Code (the "Bankruptcy Code").

6715478_1

## INTRODUCTION

This is a single asset realty case that presents a classic situation of a debtor seeking the protections of chapter 11, despite having no legitimate prospect for reorganization, simply to delay a foreclosure. The Debtor's only asset is two parcels of real estate that are fully encumbered by Umpqua. The Debtor has few, if any, valid unsecured creditors, no employees, and no clear incentive to pursue this Chapter 11 Case other than forestall Umpqua's foreclosure sale. Congress did not intend Chapter 11 to be used in this manner, particularly where state courts can better adjudicate the rights between the two parties in interest here: Umpqua and Debtor.

Accordingly, Umpqua seeks dismissal of the Debtor's Chapter 11 Case under 11 U.S.C. § 1112(b). Alternatively, Umpqua requests that this Court lift the automatic stay under 11 U.S.C. § 362(d)(1) or (d)(2) to allow Umpqua to continue prosecution of its foreclosure action, foreclose on its collateral, and pursue the Guarantor for any deficiency that may exist.

## BACKGROUND

### The Debtor's Business

The Debtor is a Nevada limited liability company that owns real property located in Reno, Nevada at 3715 Lakeside Drive, APN #023-760-03 and 3735 Lakeside Drive, APN #023-760-04 (the "Property"), and percentage interest in #023-760-05 (common area)/ which it leases to Silver State Hearing and Alan Topham, D.D.S. (the "Tenants"). Debtor's only source of income is the rent derived from the Tenants.

The Property is a part of a common interest community as defined under NRS Chapter 116, which includes a total of three (3) buildings. On or about November 21, 2010 the Debtor's managing member, Don Chang ("Chang"), acting in his then capacity as developer of the Lakeside Professional Center, formed the Lakeside Professional Center Management Association, Inc. (the "Association").[1] The Association was formed to control, manage, and collect assessments, dues, fines and interest from all the property

---

[1] The Association was not incorporated until February 23, 2015.

owners to pay for common interest expenses and reserves. Chang was initially responsible for the Association. On or about February 20, 2015, it was discovered by other Association members that, for several years, Chang had not been depositing the Debtor's share of monthly assessments and reserves. As a result, on or about February 21, 2015, Chang resigned from control of director responsibilities with the Association. The Association has now filed suit against Chang and the Debtor for Fraud, Concealment, Conversion, Breach of Fiduciary Duty, Breach of Contract, Attorney's fees and costs, and Accounting in the Second Judicial District Court, State of Nevada in and for the County of Washoe, Case No. CV15-000865.

**The Loan Documents**

On or about June 8, 2005, Debtor made, executed and delivered to Northern Nevada Bank, predecessor-in-interest to Nevada Security Bank, predecessor-in-interest to Umpqua, a Promissory Note in the principal sum of $2,180,000,00 (hereinafter "Note"). *See* Declaration of Larry Straka in Support of Motion of Umpqua Bank Pursuant to 11 U.S.C. §§ 1112(b), 362(d), 361, and 363 or an Order Dismissing the Bankruptcy Case Or In The Alternative, Granting Relief From The Automatic Stay ("Straka Declaration") at ¶ 2. A true and correct copy of the Note is attached to the Straka Declaration as Exhibit "A" and incorporated herein by reference. The Note provides that the Debtor promises and agrees to pay the principal sum of $2,180,000.00 or so much as may be outstanding, together with interest at the rate set forth in the Note, payable in monthly payments with a maturity date of June 10, 2016. *Id.* The purpose of the Note was to construct three (3) buildings located at 3705 Lakeside Drive, Reno, Nevada. *Id.*

To secure repayment of the indebtedness evidenced by the Note, Debtor executed and caused to be recorded a Deed of Trust in favor or Northern Nevada Bank. *See* Straka Declaration at ¶ 3. A true and correct copy of this Deed of Trust is attached to the Straka Declaration as Exhibit "B"

On or about November 2, 2005, the Debtor made, executed and delivered to Northern Nevada Bank, a Debt Modification Agreement (hereinafter "MOD1"). *See* Straka Declaration at ¶ 4. A true and correct copy of the MOD1 is attached to the Straka

6715478_1

Declaration as Exhibit "C" and incorporated herein by reference. The purpose of MOD1 was to increase the Note amount from $2,180,000.00 to $2,624,000.00. *Id.*

To secure repayment of the new indebtedness evidenced by the MOD1, Debtor executed and caused to be recorded a Modification of Deed of Trust in favor or Northern Nevada Bank. *See* Straka Declaration at ¶ 5. A true and correct copy of this Deed of Trust is attached to the Straka Declaration as Exhibit "D".

On or about November 30, 2005, the Debtor made, executed and delivered to Northern Nevada Bank, a second Debt Modification Agreement (hereinafter "MOD2"). *See* Straka Declaration at ¶ 6. A true and correct copy of the MOD2 is attached to the Straka Declaration as Exhibit "E" and incorporated herein by reference. The purpose of MOD2 was to delete the second phase interest rate of the Note, providing for a variable rate note after June 10, 2006 and to restructure the Note payments. *Id.*

To secure repayment of the new indebtedness evidenced by the MOD2, Debtor executed and caused to be recorded a Modification of Deed of Trust in favor or Northern Nevada Bank. *See* Straka Declaration at ¶ 7. A true and correct copy of this Deed of Trust is attached to the Straka Declaration as Exhibit "F".

On or about July 10, 2006, the Debtor made, executed and delivered to Northern Nevada Bank, a Debt Modification Agreement (hereinafter "MOD3"). *See* Straka Declaration at ¶ 8. A true and correct copy of the MOD3 is attached to the Straka Declaration as Exhibit "G" and incorporated herein by reference. The purpose of the MOD3 was to provide a short term extension of the construction phase of the Note (until October 10, 2006), to allow the Debtor to find a tenant for the vacate space. *Id.*

On or about November 6, 2006, Northern Nevada Bank was acquired by Nevada Security Bank. *See* Straka Declaration at ¶ 9.

Thereafter, on or about December 15, 2008, the Debtor made, executed and delivered to Nevada Security Bank, predecessor-in-interest to Umpqua a Change in Terms Agreement (hereinafter "CIT1"). *See* Straka Declaration at ¶ 10. A true and correct copy of the CIT1 is attached to the Straka Declaration as Exhibit "H" and incorporated herein by reference. The purpose of the CIT1 was to reflect a pay down of the Note and restructure the Note payments. *Id.* As of December 15, 2008, the principal amount owed was

$1,918,841. *Id.* Under the CIT1, the maturity date of the Note changed from July 10, 2016 to July 15, 2016. *Id.*

On June 18, 2010, the Nevada State Financial Institutions Division closed Nevada Security Bank in Nevada and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. *See* Straka Declaration at ¶ 11. That same day, Umpqua assumed the banking operations of Nevada Security Bank from the FDIC under a whole bank purchase and assumption agreement with loss-sharing. *Id.* Umpqua's loan with the Debtor is one of the loans acquired from the FDIC as the receiver for Nevada Security Bank. *Id.* Umpqua is the successor in interest to Northern Nevada Bank and Nevada Security Bank. *Id.*

On or about October 15, 2010, the Debtor made, executed and delivered to Umpqua a Change in Terms Agreement (hereinafter "CIT2"). *See* Straka Declaration ¶ 12. A true and correct copy of the CIT2 is attached to the Straka Declaration as Exhibit "I" and incorporated herein by reference. The purpose of the CIT2 was to reflect a pay down of the Note and restructure the Note payments. *Id.* As of October 15, 2010, the principal amount owed was $1,242,791.96. *Id.* Pursuant to the CIT2, Debtor's monthly payments were to be $9,860.67 per month with a final balloon payment of $1,085,045.69 due on June 15, 2016. *Id.*

Thereafter, on or about May 6, 2011, the Debtor made, executed and delivered to Umpqua another Change in Terms Agreement (hereinafter "CIT3"). *See* Straka Declaration at ¶ 13. A true and correct copy of the CIT3 is attached to the Straka Declaration as Exhibit "J" and incorporated herein by reference. The purpose of the CIT3 was to modify the maturity date of the Note to June 15, 2012, reduce the interest rate to a fixed 5.50% and restructure the Note payments. *Id.* As of May 6, 2011, the principal amount owed on the Note was $1,240,957.93. *Id.* Under the CIT3, Debtor's monthly payments were reduced to $7,692.00 per month with a final balloon payment of $1,225,025.92 due on June 15, 2012. *Id.*

To secure repayment of the new indebtedness evidenced by the CIT3, Debtor executed and caused to be recorded a Modification of Deed of Trust in favor of Umpqua.

*See* Straka Declaration at ¶ 14. A true and correct copy of this Deed of Trust is attached to the Straka Declaration as Exhibit "K".

On or about June 15, 2012, the Debtor made, executed and delivered to Umpqua a Modification of Note Agreement another Change in Terms Agreement (hereinafter "MOD4"). *See* Straka Declaration at ¶ 15. A true and correct copy of the MOD4 is attached to the as Straka Declaration Exhibit "L" and incorporated herein by reference. The sole purpose of the MOD4 was to extend the maturity date of the Note to June 15, 2013. *Id.*

On or about December 27, 2013, the Debtor made, executed and delivered to Umpqua the last Change in Terms Agreement (hereinafter "CIT4"). *See* Straka Declaration at ¶ 16. A true and correct copy of the CIT4 is attached to the Straka Declaration as Exhibit "M" and incorporated herein by reference. The CIT4 restructured the payment schedule of the Loan into two streams. *Id.* The principal balance owed at the time of the Change in Terms was 1,184,593.90. *Id.* Under the CIT4, the Loan's maturity date was extended to January 20, 2015. *Id.*

The Note matured on January 20, 2015. *See* Straka Declaration at ¶ 17. As of today's date, the Debtor has not fulfilled its obligations under the terms of the Note and Umpqua is currently owed $1,289,616.90. *Id.*

**The Default, Lawsuit, and Subsequent Bankruptcy**

Debtor defaulted under the Loan Agreement by failing to pay the Loan balance by the January 20, 2015 maturity date. *See* Straka Declaration at ¶ 18. Consequently, on or about March 31, 2015, Umpqua initiated a non-judicial foreclosure on the Property in an effort to collect on the unpaid Note. *Id* at ¶ 19. Less than a month before the Trustee Sale, Debtor filed the above-captioned chapter 11 bankruptcy case, admittedly in order to defeat the foreclosure suit. *Id.* at ¶ 20.

A. **ARGUMENT The Debtor's Bad Faith Filing Constitutes Cause for Dismissal of this Chapter 11 Case Under Bankruptcy Code Section 1112(b).**

Bankruptcy Code section 1112(b) authorizes this Court to dismiss a bankruptcy case for "cause." 11 U.S.C. § 1112(b). Although "cause" is not defined in the Bankruptcy

6715478_1

Code, section 1112(b) sets forth a non-exhaustive list of factors that can constitute cause for dismissal. This Court, as well as many others, has consistently found that "bad faith" constitutes "cause" for dismissal under section 1112(b). *Meadowbrook Investors' Group v. Thirtieth Place, Inc. (In re Thirtieth Place, Inc.)*, 30 B.R. 503, 505 (9th Cir. BAP 1983); *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 210 (3d. Cir. 2003) ("bankruptcy courts may dismiss Chapter 11 filings for 'cause' if a petition is filed in 'bad faith'").

In determining whether a petition was filed in bad faith, courts "must weigh a variety of circumstantial factors" including whether:

- The debtor has only one asset;
- Debtor has an ongoing business to reorganize;
- There are any unsecured creditors;
- The debtor has any cash flow or sources of income to sustain a plan of reorganization or to make adequate protection payments;
- The case is essentially a two party dispute capable of prompt adjudication in state court.

*See In re St. Paul Self Storage Ltd. Partnership*, 185 B.R. 580, 582-83 (9th Cir. BAP 1995); *see also In re Oklahoma P.A.C. First Ltd. Partnership*, 122 B.R. 394 (Bankr. D. Ariz. 1990) (listing additional factors, such as whether (a) secured creditor's liens encumber debtor's sole asset, (b) debtor has any employees, (c) there are allegations of wrongdoing by debtor, (d) debtor was created on eve of foreclosure to isolate insolvent property and its creditors, and (e) bankruptcy offers only possibility of forestalling loss of property); *State Street Houses*, 356 F.3d 1345, 1346-47 (11th Cir. 2004) (listing similar factors).

Here, it cannot be disputed that the Debtor's Chapter 11 Case has <u>all</u> of the common attributes of an unjustified and improper filing, and should be dismissed. *See St. Paul Self Storage*, 185 B.R at 583 ("[W]hen factors such as these indicate that a debtor is unreasonably deterring or harassing creditors rather than attempting a speedy and feasible reorganization, the court may conclude that the petition has been filed in bad faith and

6715478_1

dismiss it"); *see also In re McCormick Road Associates,* 127 B.R. 410, 413 (N.D. Ill 1991) ("courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights").

> 1. <u>This case is a two party dispute, with very few creditors, concerning Debtor's only asset.</u>

Courts "view with a jaundiced eye Chapter 11 petitions by debtors with a single asset and with no meaningful body of creditors other than those who hold a mortgage on the single asset." *In re South County Realty, Inc. II,* 69 B.R. 611, at 615 (Bankr. M.D. Fla. 1987). Here, Debtor cannot dispute that it filed this bankruptcy to avoid the Foreclosure Action, which is in and of itself a factor in the bad faith analysis. *See In re Leavitt,* 171 F.3d 1219, 1225 (9th Cir. 1999) (filing where "debtor only intended to defeat state court litigation" is factor in considering bad faith); *In re Tekena USA, LLC,* 419 B.R. 341, 346 (Bankr. N.D. Ill. 2009) ("One of the hallmarks of bad faith in filing a petition is pre-petition litigation already pending in the state court between the parties").

Thus, "reduced to its essence, this case is a two-party dispute" that warrants dismissal so that Umpqua can complete its non-judicial foreclosure. *In re Tucson Properties Corp.,* 193 B.R. 292, 300 (Bankr. D. Ariz. 1995) (dismissing chapter 11 where, among things, filing was "simply a tactical maneuver, knowing that the court process is lengthy and sometimes slow, designed to gain more time and distance in an effort to wear down its exhausted secured creditor into some type of settlement submission"); *In re State Street Houses, Inc.,* 356 F.3d 1345 (11th Cir. 2004) (affirming dismissal on "bad faith" grounds of petition filed by single asset real estate chapter 11 debtor with few creditors).

Debtor will no doubt point to its two alleged unsecured creditors in an attempt to buttress its claims of reorganization, rather than mere avoidance of foreclosure. However, a review of those two claims total $36,000.00, which is but a fraction of the amount due to Umpqua. Further, the scheduled $30,000 unsecured claim of the Association is the subject of pending state court litigation precipitated by the managing member of the Debtor's bad

8

6715478_1

faith conduct. The Association's claim, in actuality, is largely a secured claim. *See* Docket No. 16 at 6:17-18.

Even if the entire purported $36,000 in unsecured debt were legitimate, these claims only amount to 3.0% of Umpqua's secured claim, which is still indicative of Debtor's bad faith. *See In re Vallambrosa Holdings, L.L.C.*, 419 B.R. 81 (Bankr. S.D. Ga. 2009) (finding this factor in favor of dismissal where debtor has approximately $2 million in unsecured claims, representing a mere 6.45% of the $31 million in secured claims); *State Street Houses*, 356 F.3d at 1346-47 (lack of good faith where secured claims were $14,400,000 and unsecured claims were $3,000,000).

Taken together, the bad faith factors demand dismissal. In *In re Investors Florida Aggressive Growth Fund, Ltd.*, for example, the debtor's primary asset was an apartment complex, the unsecured creditor claims amounted to less than 1% of the secured claims, the debtor had no employees, and the petition was filed shortly before a hearing to appoint a receiver, "an action initiated only after the [d]ebtor ceased making loan payments…" *See* 168 B.R. 760, 767-68 (Bankr. N.D. Fla. 1994). The court found, "[t]he case represents a two party dispute inasmuch as the Debtor was unsuccessful in renegotiating more favorable terms of the mortgage loan with [the secured creditor]." *Id.* Just as in this case, where Debtor has complained about Umpqua's prepetition position regarding restructuring of the Loan Agreement and the Notes,[2] "the timing of the petition together with the [d]ebtor's unsuccessful pre-petition attempts to re-negotiate with [the secured creditor]" should lead the Court "to conclude that the petition was filed with the intent to forestall [the secured creditor]'s collection rights and to unilaterally impose the mortgage terms deemed acceptable to the Debtor on an unwilling creditor." *Id.* ("[t]he Code is not to be viewed as an alternative to traditional refinancing by providing a vehicle for debtors to draft their own loans with existing creditors," and concluding that the petition was filed in bad faith); *In re Sherman*, 2009 WL 1607856 (Bankr. D. Ariz. 2009) (chapter 13 case

---

[2] Debtor "was unable to meet its matured debt payment obligations, and Umpqua has been unwilling to extend the loans." Straka Declaration at ¶ 16.

9

6715478_1

dismissed where entire case was devoted to restructuring a husband's payout to his ex-wife and their divorce attorneys, and where status of ex-wife as to the community property was still unsettled and best left to the state court).

This Court should dismiss this bankruptcy and permit Umpqua to exercise its bargained-for rights under the Loan Agreement in the Foreclosure Action, rather than let Debtor continue supporting this case on the back of a speculative Section 363 sale and unfiled liquidating "reorganization" plan. In this, the Debtor has not established that the existence of a legitimate business or economic reason why the mere existence of Chang's personal guaranty allows for separate classification of Umpqua's deficiency claim, even leaving open the potential for a confirmable cramdown plan. *See In re NNN Parkway 400 26, LLC*, 505 B.R. 277, 284 (Bankr. C.D. Cal. 2014) ("a guaranty from an insolvent guarantor provides nothing meaningful and so it becomes a distinction without a difference and cannot alone support separate classification); *see also Wells Fargo Bank, N.A. v. Loop 76, LLC*, 465 B.R. 525, 536-37 (9th Cir. BAP 2012); *In re 4th Street East Investors*, 2012 WL 1745500 at * 8 (Bankr. C.D. Cal. 2012).

2. <u>Debtor has no ongoing business to reorganize and no hope of reorganization.</u>

Dismissal on grounds of bad faith is also appropriate where "there is no realistic possibility of an effective reorganization." *See, e.g., In re Pegasus Wireless Corp.*, 2010 WL 3096149, *1 (11th Cir. 2010). An "effective reorganization" means a plan that is confirmable under section 1129 of the Bankruptcy Code.

Debtor is a special purpose vehicle whose sole business consists of leasing the Property; however, the rents received is inadequate income to make its Note payments, Association assessment and reserve payments, and pay property taxes. That income stream is simply insufficient to pay Lender the nearly $1.3 million it is owed under a traditional reorganization plan, no matter how far Debtor attempts to stretch out the debt. Any suggestion to the contrary is speculative at best.

Further, to the extent the Debtor appears to be attempting to sell its real property and later propose a liquidating plan, Debtor has not identified any source of new value, revenue or capital that can be used to fully pay off the Debtor's secured creditors and satisfy administrative expense claims, much less provide a recovery to any unsecured creditors. In this, the Debtor has not addressed Umpqua's credit bid rights, or how it proposes to pay the full balance due Umpqua as an objecting secured creditor. *See* 11 U.S.C. §§ 363(f)(3), (k).[3] Accordingly, this case should be dismissed.[4]

### B. The Lender is Entitled to Relief from the Automatic Stay Under Both Sections 362(d)(1) and (d)(2).

Alternatively, if this Court does not grant dismissal under section 1112(b) of the Bankruptcy Code, several independent grounds exist to justify granting the Lender relief from the automatic stay to prosecute the Foreclosure Action.

#### 1. Cause exists under 362(d)(1) to lift the automatic stay.

Under section 362(d)(1), bad faith is grounds to lift the automatic stay. *See In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986) (bad faith can constitute cause to lift the automatic stay under Section 362(d)(1)); *In re Duvar Apt., Inc.*, 205 B.R. 196, 200 (9th Cir. BAP 1996) ("existence of bad faith in commencing a bankruptcy case constitutes cause for granting relief from the stay pursuant to Section 362(d)"). A court may lift the stay based on a finding of bad faith even if it permits the bankruptcy petition to be maintained. *See In re Dixie Broadcasting, Inc.*, 871 F.2d 1023, 1029 (11th Cir. 1989).

For the same reasons described above warranting case dismissal, this Court should lift the automatic stay for "cause" under section 362(d)(1) of the Bankruptcy Code, based on the Debtor's bad faith filing of the Petition, and permit the Foreclosure Action to proceed.

---

[3] For avoidance of doubt, Umpqua objects to the sale recently proposed by the Debtor free and clear of Umpqua's lien. *See* Docket No. 16 at 6:18—7:2.

[4] Moreover, as an undersecured creditor, Umpqua reserves the right to make its Section 1111(b) election, thereby treating the entire debt as secured. *See e.g.*, *Weinstein v. First Federal Bank of California*, 227 B.R. 284, 294 (9thCir. BAP 1998). In such a case, Umpqua would also retain its lien on the Collateral for the full amount of its claim. *Id.* If an undersecured Umpqua does not make its § 1111(b) election, then its deficiency claim will likely control the unsecured creditor class, potentially blocking plan confirmation.

11

6715478_1

However, should the Court not find the Debtor's bad faith alone warrants lifting the automatic stay, relief from the automatic stay should nevertheless be granted for lack of adequate protection of the Lender's security interest in its Collateral under section 362(d)(1) of the Bankruptcy Code. There is no equity cushion and Debtor adequate protection payments to date are insufficient to protect Umpqua's interest—particularly since the Note fully matured before the Petition Date.

In light of the foregoing, stay relief under section 362(d)(1) is appropriate.

### 2. Stay Relief is Warranted Because the Debtor Has No Equity in the Project and it is Not Necessary to an Effective Reorganization[5]

The Bankruptcy Schedules list the value of the Property at $1,200,000. Lender's debt currently exceeds 1,289,000.00. The Bankruptcy Schedule lists $24,198.25 in unpaid real estate taxes and an Association lien in the sum of $71,671.37 for unpaid association assessments. *See also* Docket No. 16 at 6:6-18. Debtor is not currently paying any Association assessment or reserves which are required under the CC&Rs, and has not paid any since the filing of Chapter 11. *See* Straka Declaration at ¶ 22. Upon information and belief, the Debtor currently owes approximately $40,000.00 in unpaid Reserves to the Association[6]—in addition to its unpaid assessments. *Id.* at 23.

In order for a debtor to defeat a motion for relief from stay where the debtor has no equity in the property at issue, the debtor must show that there is a reasonable possibility of a successful reorganization within a reasonable period of time and the property at issue must be necessary for that reorganization. *United Savings Associations v. Timbers of Inwood Forest Assoc. Ltd.* 484 U.S. 365, 375-76 (1987). As the Supreme Court explained in *Timbers* the phrase "necessary for an effective reorganization" means more than that the property will be needed for a conceivable reorganization-rather, the property must be "essential for an effective reorganization that is in prospect." *Id.* at 376. The Debtor's

---

[5] Umpqua believes stay relief is further warranted under 11 U.S.C. 362(d)(3) as no confirmation plan has been filed.
[6] Apparently Chang's recording keeping was poor the subsequent Association management has been unable to date to provide a complete accounting of the amounts owed. As a result, Umpqua has used its best efforts to attempt to formulate an estimate of the amount of outstanding based almost entirely on the information available in the current Association management.

6715478_1

bears the burden of proving the Property is necessary to an effective reorganization under 11 U.S.C. § 362(d)(2)(B). *See* 11 U.S.C. § 362(g).

The Debtor does not generate sufficient revenue to confirm a reorganization Plan and, as discussed above, the Debtor has shown no prospect of an effective reorganization or confirmable liquidation Plan. For these reasons, the Lender submits relief from stay is also warranted under section 362(d)(2). *See, e.g., In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, 75 (9th Cir. BAP 1994) (discussing stages of meeting the *Timbers* test and stating "[n]ear the expiration of the exclusivity period, the debtor must offer sufficient evidence to indicate that a successful reorganization within a reasonable time is 'probable'") (internal quotation omitted), *quoting In re Holly's Inc.*, 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992).

## CONCLUSION

Umpqua respectfully requests that the Court dismiss Debtor's bankruptcy case under § 1112(b) for bad faith, or, in the alternative, grant stay relief under § 362(d)(1) and (2).

DATED this 5th of October, 2015.

LEWIS ROCA ROTHGERBER LLP


By: /s/ Scott S. Hoffmann
Scott S. Hoffmann, Esq., SBN 8498
*Attorneys for Umpqua Bank.*

13